UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 16-10038-IT |
| CODY HERR, | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| _____ | ) | |

**ORDER ON DEFENDANT'S MOTION TO COMPEL**

August 2, 2016

Hennessy, M.J.

Before the court is Defendant Cody Herr's motion to compel discovery, in accordance

with Local Rule 116.6.  (Docket No. 40).  The United States filed an opposition (Docket No. 43).

At the request of Defendant, the court heard oral argument on July 7, 2016.  Thereafter, the court

directed Defendant to prepare a proposed protective order, and invited the United States to

submit any opposition to the protective order.  (Docket No. 49).  Defendant submitted a proposed

protective order (Docket No. 51), and the United States filed an opposition to the protective

order on July 22, 2016.  (Docket No. 56).  The matter is now ripe for adjudication.  For the

reasons discussed below, the motion is granted in part and denied in part.

**Procedural History**

Defendant Herr is charged by indictment with Murder for Hire, and Possession of a Firearm

in Furtherance of a Crime of Violence.  See Docket No. 6.  Pursuant to 18 U.S.C. § 924(c), the

latter charge carries a penalty of five years on and after any sentence imposed on the charge of

murder for hire.  Apart from the instant motion to compel discovery, there is pending Defendant's motion to dismiss the Section 924(c) charge.  <u>See</u> Docket No. 50.  Despite this litigation posture, Defendant requested at the July final status conference, that the case be transferred to the District Judge for a Rule 11 hearing.  <u>See</u> Docket No. 48.  As discussed below, this request factors into the court's determination of the instant motion.

The genesis of the instant motion is a discovery request dated April 25, 2016, in which Defendant seeks discovery regarding a cooperating witness ("CW") who assisted agents in investigating this case.  <u>See</u> Docket No. 40-1.  The discovery request seeks 15 items.  The United States responded by letter dated May 26, 2016.  <u>See</u> Docket No. 40-2.  It agreed to comply with requests 14 and 15, but declined to produce information responsive to Requests 1 through 13.

Requests 1 through 4 are so-called 28-day materials; that is, information that the District Court's Local Rule 116.2(b)(1) requires the government to produce within 28 days of arraignment. Defendant cites Local Rule 116.2 as authority for three of these requests.

Requests 5 through 12 seek materials that the government characterizes as 21-day materials; that is, information the District Court's Local Rule 116.2(b)(2) requires the government to produce not later than 21 days before trial.  The government supports its position by comparing the requests to the categories of information called for by this Local Rule.  Defendant's letter cites no authority for production of such 21-day materials.

A last contested item seeks an unredacted video and audio recording of a meeting in which Defendant, a cooperating witness and -- at least for part of the meeting -- an undercover agent participate.  An unredacted audio has been produced; the government objects to producing an unredacted video which may show an image of the CW and thereby identify him to Defendant.

**Relevant Factual History**

In 2015 the CW was the cellmate of one Adam Bradley.  Bradley was awaiting trial for a 2012 murder.  See Complaint Affidavit ("Aff.") ¶¶4, 6-7.  Bradley asked the CW to murder a trial witness and gave the CW the witness's name, description, and place of employment.  See Aff ¶ 7.  This witness had already testified at the trial of two of Bradley's codefendants.  One was convicted of murder and received a life sentence; the other was convicted of obstructing a police investigation and received a 5 to 7-year sentence.  See Aff. ¶ 5.  To facilitate their communications about the murder, the CW and Bradley adopted a code as follows:  a cell phone meant a gun; a battery meant ammunition; make it snow meant do the murder; Snowman was the CW; Gingerbread man was Bradley.  See Aff. ¶ 7.

After the plan was made, the CW was released from custody on conditions, including electronic monitoring.  See Aff. ¶ 11.  Through his attorney, the CW reported the plan to the Massachusetts State Police ("MSP").  See Aff. ¶ 8.  The CW said he never intended to commit the murder and that he was coming forward in part to protect the witness.  See id.  The CW also got a message to Bradley through an intermediary that, as a result of the electronic monitoring condition, the CW would not be able to kill the trial witness.  See id.  In response, Bradley sent the CW a letter dated September 30, 2015, in which he urged the CW to carry out the hit if the CW could and that Bradly would pay the CW $30,000 and more, but that if the CW could not, then Bradley would send his cousin to come pick up the 'cell phone.'  See Aff. ¶ 11.  Bradley said that he would give his cousin the CW's number so that they could arrange the delivery of the gun.  See id.  Bradley also told the CW that if the CW could not deliver the gun "then call my mom [providing phone number and name] and tell her to tell me 'that you still have the same cell phone number' code as in you still have the 'cell phone' with batterys [sic]."  See id.

In early November 2015, the CW was contacted by an individual, later identified as Defendant.  <u>See</u> Aff. ¶ 12.  Defendant asked the CW for the "cell phone."  <u>See Id.</u>  Defendant had recently been released from custody where he had been housed with Bradley.  <u>See id.</u>  The CW did not know Defendant.  <u>See id.</u>  On November 11 and 20, 2015, the CW and Defendant exchanged text messages arranging a meeting so Defendant could retrieve the gun.  <u>See</u> Aff. ¶¶13-14.  On December 3, 2015, the CW made a recorded phone call to Defendant during which the CW told Defendant that "it's a 9 millimeter" and asked if that was "OK."  <u>See</u> Aff. ¶ 15. Defendant said that he could handle it, that he had handled "Barettas, Glocks" and that guns were his forte.  <u>See id.</u>  The CW asked about the murder: whether Defendant knew where to go and the witness's name, and Defendant indicated that he did. <u>See id</u>.

On December 8, 2015, under the direction of law enforcement, the CW sent Bradley a letter, writing that he had been in contact with his cousin "Cash" (the nickname Defendant provided) and asked: "So this dude Cash this is the dude? You OK with me giving him cellphone [the gun]?  Cuz even even tho I aint making it snow I'm still getting my part."  <u>See</u> Aff. ¶ 16. Then the CW made a recorded phone call to Defendant, reporting that he had written Bradley and was waiting for confirmation from Bradley before he proceeded.  <u>See</u> Aff. ¶ 17.  Defendant expressed disappointment, indicating that he had wanted to see the CW that day and saying that his time span was short and he was "trying to get this done as soon as possible."  However, he agreed to wait.  <u>See id.</u>

Bradley thereafter contacted the CW through others, including by causing the girlfriend of another inmate to send the following text message: "*My name is Payton I'm his cellies girlfriend they told me to text you…the ginger bread man said the he got your letter he said it's okay to give to his cousin kush and he needs his number asap if you want give it to me and I can*

*pass the message…sorry I'm working but no I'm Julian's girl not sure if you know him and I can tell him when he calls me later on today…"*  See Aff. ¶¶ 18-19.

On December 15, 2015, during a recorded call to Defendant, the CW told said he had gotten the green light and proposed that Defendant meet at an MBTA Station the next day at noon, to which Defendant agreed.  See Aff. ¶ 21. On the afternoon of December 16, 2015, the CW went to the MBTA station.  See Aff. ¶ 25.  He was operating an undercover vehicle outfitted with audio and video recording equipment.  See id.  At approximately 4:09 p.m., after phone communication with the CW, Defendant got into the undercover vehicle with the CW.  See Aff. ¶ 26.  During the ride, Defendant indicated that he had engaged in a three-way conversation with Bradley the previous day.  See id.  The CW asked Defendant if he was going to "take this [the gun] and do it," and Defendant responded in the affirmative.  See id.  The CW asked Defendant whether he had "the balls" to "go in and shoot her in the face," and Defendant confirmed that he did.  See id.  Later in the conversation the CW told Defendant that he should not simply "take it and not do it," and Defendant said that he knew what the CW meant.  See id.  The CW told Defendant that he should "shoot her in the fucking face" and that Defendant did not want any witnesses, and Defendant said, "I know."  See id.

The CW drove to a parking lot, where an ATF agent, acting in an undercover capacity, entered the rear seat.  See Aff. ¶ 27.  The UC opened a bag he was carrying and removed and opened a locked pistol box. See Id.  The UC handed Defendant a Glock, Model 19, 9mm pistol. See Aff. ¶ 28.  Defendant examined the firearm and declared it a "solid piece."  See id.  He gave it back to the UC.  See Aff. ¶ 29.  At approximately 4:20 p.m. the UC exited the CW vehicle, and shortly thereafter agents converged on the vehicle and arrested Defendant.  See Aff. ¶ 30.

**Relevant Law**

As an initial matter, it should be noted that this is not a motion to compel exculpatory information pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny, and the court's ruling here is not intended to provide guidance on the government's constitutional obligations in accordance with the Court's jurisprudence.

Relevant here are the Local Rules, which prescribe a protocol for the scope and timing of discovery in a criminal case.  Local Rule 116.2 requires the United States to produce within 28 days of arraignment, among other things, the following for any witness whom the government anticipates calling in its case-in-chief:

> a description and, if reduced to writing, copy of each promise, reward, or inducement given to the witness, and the name of such witness;

> the criminal record (if any) and the name of the witness to whom the record belongs; and,

> a written description of any pending criminal cases, and the name of witness so charged.

<u>See</u> L.R. 116.2(b)(1)(C) through (E) and L.R. 116.1(c )(1) (setting the time for disclosure within 28 days of arraignment).   These requirements, it is argued, govern Requests 1 through 4.

Local Rule 116.2(b)(2) – which is relevant to Requests 5 through 12 -- requires the United States to produce not less than 21 days before an established trial date what is largely impeachment material for any witness the government anticipates calling in its case-in-chief.   <u>See</u> L.R. 116.2(b)(2)(A) through (G).

Finally, each of these provisions is subject to the government's right to decline to produce information called for by the Local Rules.  Local Rule 116.6 prescribes a declination procedure; in relevant part, the Local Rule states:

> If in the judgment of a party, it would be detrimental to the interests of justice to make any of the disclosures required by these Local Rules, such disclosures may be declined … If

the opposing party seeks to challenge the declination that party shall file a motion to compel that states the reasons whey disclosure is sought.

**Analysis**

I deal first with Requests 5 through 12.  I agree with the United States that these materials are so-called 21-day materials (a characterization that Defendant has not disputed), required by Local Rule 116.2(b)(2) to be produced not less than 21 days before trial.  In declining to produce these materials, the United States relies principally on the Court's decision in United States v. Ruiz, 536 U.S. 622 (2002).   There, discussing the government's obligation to produce impeachment materials in a criminal case, Justice Breyer, writing for a unanimous Court, said:

> [A] constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice.  The Ninth Circuit's rule risks premature disclosure of Government witness information, which, the Government tells us, could disrupt ongoing investigations and expose prospective witnesses to serious harm.  And the careful tailoring that characterizes most legal Government witness disclosure requirements suggests recognition by both Congress and the Federal Rules Committees that such concerns are valid.

Id. at 631-32 (citations and internal quotations omitted).

Defendant's principal argument for discovery is that the Local Rule's limitation of "not less than 21 days before trial," means essentially any time before trial.  Defendant also argues that production at an early day avoids a "document dump" 21 days before trial and thus facilitates a Defendant's proper preparation for trial.  Finally, Defendant invokes generally an argument that such materials should be produced "as a matter of principle."  In my view, the government has the more persuasive argument.

Defendant's reliance on Local Rule 116.2(b)(2) ignores the full text of the rule.  Production is not required merely 'not later than 21 days before trial;' rather, "[n]ot later than 21 days before

the trial date established by the judge who will preside at the trial." <u>See</u> Local Rule 116.2(b)(2).

Here, District Judge Talwani has not established a trial date.  Indeed, since Defendant has requested

that the case be transferred to Judge Talwani for the purpose of a change of plea to guilty, the

prospect of Judge Talwani ever establishing a trial date, and thereby triggering the government's

21-day discovery obligation under the Local Rule, is remote.  This reading of the Local Rules is

consistent with <u>Ruiz</u>, which limits the government's obligations of production of impeachment

materials to a Defendant's rights at trial, and not before.  Accordingly, I deny the motion to compel

production of Requests 5 through 12.

Requests 1 through 4 are core 28-day discovery; that is, discovery Local Rule 116.2(b)(1)

requires the United States to produce within 28 days of arraignment.  The government does not

contest this.  Indeed, it has agreed to produce to Defendant the 28-day discovery, but with

redactions of identifiers, such as name, date of birth, social security number, docket numbers for

criminal cases – information by which the CW could be identified.  <u>See</u> Docket No. 56.

Similarly, the United States opposes production of an unredacted video recording of the

December 15 meeting.  As to these identifiers and the video, the United States invokes the

declination procedure set forth in Local Rule 116.6.  As such, it bears the burden of to

demonstrate why disclosure should not be required.  <u>See</u> Local Rule 116.6(a).

The government relies principally on the nature and circumstances of the offenses

charged in this case, and the danger to the safety of the CW should full disclosure be made.  This

opposition is certainly not without some force.  Defendant is charged with murder for hire.  As

discussed above, Defendant represented that guns were his forte and that he had no hesitation

about committing a murder in order to reduce the likelihood that Bailey would be convicted of

the 2012 murder.  Among the evidence of the danger Defendant poses is the recording of the

December 15 meeting during which Defendant stated that he is prepared to commit the offense

and "shoot the [targeted victim] in the face."   When challenged whether Defendant was

committed to killing the witness, Defendant repeatedly stated that he was.

In opposition, Defendant argues any danger to the CW is largely neutralized, and that the

government's concern is "generic."  Defendant correctly notes that Defendant is detained and

that there are no known threats against the CW.  In this regard, I disagree with Defendant.  The

affidavit demonstrates that jail is no impediment to the murder for hire:  Bailey himself easily

circumvented any restrictions on his communications by using code, writing letters, recruiting

others to communicate through three-way telephone calls and delivering messages.  Hence, as

the allegations in this case show, the fact that Defendant is behind bars does not neutralize

Defendant entirely.

Similarly, I do not find that the government's concern is "generic."  Again, the

allegations show not only that Defendant was willing to commit a murder, but that he was

anxious to do so.  He was disappointed when the CW said he wanted to confirm with Bailey that

the gun could be given to Defendant, and once the CW received authorization, Defendant met

the CW the following day.  It is true that on the current record there is no evidence of a post-

arrest threat, but from all the record shows, that can be explained by the fact that Defendant

apparently does not know who (and where) the CW is.   This is not a case of the government

relying on a generalized concern that those charged with serious crimes have a motive to

intimidate or eliminate witness.  The allegations are more specific and troubling.

Defendant also argues that the CW is a critical witness for whom Defendant is entitled to

discovery in order to prepare a defense.  In this regard, Defendant relies on the Court's decision

in <u>Roviaro v. United States</u>, 353 U.S. 53 (1967).  There, the Court held that "[w]here the

disclosure of an informer's identity … is relevant and helpful to the defense … or is essential to a

fair determination of a cause, the [qualified] privilege [of protecting the identity of an informer]

must give way." Id. at 60-61. While this case does not fit squarely within the facts of Roviaro,

Defendant's reliance on Roviaro has merit. On one hand, the CW is by no means the only

witness. Communications with Defendant and Bailey were recorded; letters and messages are in

the custody of agents. At the critical meeting that led to Defendant's arrest, an undercover agent

also participated for part of the meeting, presenting Defendant with the gun. As to the other

parts of the meeting, they are memorialized by audio and video recording. On the other hand,

the CW will be needed to authenticate communications – the government represented at oral

argument that it will authenticate the December 15 recording through the CW. And there is no

question of CW's presence alone, or with the undercover, during the critical meeting that led to

Defendant's arrest.

      Finally, Defendant has proposed a protective order that would restrict dissemination of

the 28-day materials to counsel and the Defense Team (as defined in the protective order).

Defendant and others would not see these materials.

      Based on the foregoing considerations, I find that the United States has not met its burden

for avoiding its 28-day discovery obligations, and its obligation to produce an unredacted

recording of the video. I therefore order the United States to produce unredacted 28-day

materials and an unredacted video recording. While, as noted, the United States raises

legitimate, specific concerns for the safety of the CW, I find that the protective order, which

would restrict distribution of the 28-day material to the Defense Team, and expressly excludes

Defendant's access to the information that would identify the CW, is sufficient to address the

government's safety concerns. I agree that the CW, even if not the only key witness, is a critical

witness to the murder for hire prosecution.  He is the point of contact with Bailey and is essential

to authenticating evidence and recounting portions of the December 15 meeting during those

parts of the meeting at which the UC agent was not present.  Finally, while I recognize that

Defendant has requested a change of plea, as Defendant argued at the hearing, a guilty plea has

not yet been entered.  Unlike the 21-day materials which are required to be produced not later

than 21 days before a firm trial date (and none has yet been set), the Local Rule ties production

of the 28-day materials to arraignment, an event that has occurred.

Accordingly, the motion to compel Requests 1 through 4 and the video of the December

15 meeting, all in unredacted form, is granted.  The order is subject to Defendant's execution of

and compliance with the protective order Defendant has proposed and that this court has signed

on August 2, 2016.  The United States is directed to mark all materials subject to this Order with

a heading that states in substance "Defense Team's Eyes Only/Subject to Protective Order in

United States v. Cody Herr, 16 –CR-10038-IT.[1]


/ s / David H. Hennessy
David H. Hennessy
United States Magistrate Judge

---

[1]   The parties are hereby advised that under the provisions of Rule 2(b) of the Rules for United
States Magistrate Judges in the United States District Court for the District of Massachusetts, any
party may move for reconsideration by a district judge of the determination(s) and order(s) set
forth herein within fourteen (14) days after receipt of a copy of this order, unless a different time
is prescribed by this court or the district judge.  The party seeking reconsideration shall file with
the Clerk of this Court, and serve upon all parties, a written notice of the motion which shall
specifically designate the order or part thereof to be reconsidered and the basis for the objection
thereto.  The district judge, upon timely motion, shall reconsider the magistrate's order and set
aside any position thereof found to be clearly erroneous in fact or contrary to law.  The parties are
further advised that the United States Court of Appeals for this Circuit has indicated that failure to
comply with this rule shall preclude further appellate review.  See Keating v. Secretary of Health
& Human Servs., 848 F.2d 271 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792
F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980);
United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14
(1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140 (1985).